DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**F.H. PASCHEN, S.N. NIELSEN & ASSOCIATES LLC,**
a foreign corporation,
Appellant,

v.

**B&B SITE DEVELOPMENT, INC.,** a Florida corporation,
Appellee.

No. 4D19-3839

[February 3, 2021]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit in and for Okeechobee, County; Laurie E. Buchanan, Judge; L.T. Case No. 472016CA000326.

Caryn L. Bellus and Barbara E. Fox of Kubicki Draper, P.A., Miami, for appellant.

Kevin S. Hennessy of Lewis, Longman & Walker, P.A., St. Petersburg, and Christopher D. Johns of Lewis, Longman & Walker, P.A., West Palm Beach, for appellee.

GROSS, J.

A general contractor and a subcontractor disagree over the scope of work required by a subcontract. Litigation ensued and both parties moved for summary judgment. The circuit court denied the contractor's motion and granted summary judgment in favor of the subcontractor. We affirm the finding of liability on two counts of implied contract, but reverse and remand for a determination of damages.

### Facts

F.H. Paschen, S.N. Nielson & Associates (the "GC") was the general contractor on a project for the United States Postal Service to perform construction work at various locations, including the main post office in Okeechobee, Florida. The master contract with the Postal Service required the GC to "verify all dimensions shown of existing work . . . by actual measurement of the existing work," and to report any discrepancies to the

Postal Service's contracting office prior to submitting a price proposal for a particular project.

The GC entered into a subcontract with B&B Site Development, Inc. (the "Sub") that required the Sub to perform demolition and paving work for the parking lot of the Okeechobee post office.

Various documents used to solicit bids from potential subcontractors interchangeably used the terms "pavement," "cement concrete pavement," "existing Portland cement concrete pavement," and "existing PCC pavement" to describe what was to be demolished and removed. The GC and the Sub exchanged information prior to the execution of the subcontract.

The eastern driveway was not laid with Portland cement but asphalt. The Sub's principal examined the asphalt, which was only three years old, and found that it was in good condition and did not need replacing. The Sub's measurements at the site showed 9,000 square yards of concrete, so the Sub submitted a lump-sum bid based on that measurement.

The GC failed to perform a pre-bid site walk to verify the area of concrete to be demolished. The GC incorrectly assumed that the entire parking lot was concrete and relied upon this mistaken assumption when it submitted a price proposal to the Postal Service. That proposal quoted a price for concrete removal that included the total area of all the pavement in the parking lot, including the asphalt eastern driveway.

The GC and the Sub entered into a subcontract in December 2014. The subcontract described the project as "USPS—Okeechobee FL MPO—Replace Pavement" and provided that the Sub would perform "the work described in Schedule A." Schedule A described the scope of work as including demolition of "the existing concrete pavement." The subcontract also stated that the terms of the subcontract constituted "the full and complete agreement between the parties," with "[a]ll previous oral or written promises, negotiations, representations or agreements relating to the subject matter of [the subcontract being] hereby declared to be null and void."

Shortly after the parties executed the subcontract, the Sub provided the GC with a "job sequencing narrative" that described a sequence of tasks that did not include demolishing or repaving the asphalt on the eastern driveway. The GC responded with an email that identified the asphalt eastern driveway as "Phase B5," but which did not indicate that any work was to be performed there.

A problem arose when the project neared completion. The GC maintained that removal and replacement of the asphalt on the Phase B5 eastern driveway was within the scope of the subcontract, while the Sub disagreed, pointing to language in the subcontract that specified removal of concrete only.

Although the GC believed that replacement of the B5 asphalt fell withing the subcontract's scope of work, it requested a price proposal from the Sub. The Sub provided a proposed work order to remove 561 square yards of asphalt pavement and to replace it "to match existing contracted work" at a price of $33,386.80.

The parties came to no agreement about this extra work, with the GC maintaining that it was included in the Sub's original contract price and the Sub insisting that it was extra work outside of the subcontract. Nonetheless, the Sub proceeded with the asphalt work to avoid delaying the project, insisting that it still expected to be paid for it. The GC responded that the project architect would review the costs and proposals to "ensure that this area was not already included" in the subcontract.

The project architect reviewed the GC's bidding documents and opined that the asphalt pavement area was included in the cost of the project.

The Sub replaced the existing asphalt in the B5 area under protest and sought $33,386.80 in compensation. The GC denied the Sub's request for additional compensation, maintaining its previous position.

The Sub sued the GC in a three-count amended complaint for breach of contract, and two theories of implied contract—quantum meruit and unjust enrichment. The Sub sought damages of $33,386.80 or the reasonable value of the labor and materials it provided.

Both parties moved for summary judgment. The circuit court granted the Sub's motion for summary judgment on all three counts, denied the GC's motion, and entered judgment for $33,386.80 plus interest. This appeal ensued.

### *The Circuit Court Properly Determined that the Scope of the Subcontract was Limited to Concrete Removal*

The central issue in this case is whether the removal and replacement of the asphalt pavement on the eastern driveway fell within the scope of

the contract. The circuit court correctly ruled that the work at issue was not covered by the subcontract.

"When the language of a contract is clear and unambiguous, courts must give effect to the contract as written and cannot engage in interpretation or construction as the plain language is the best evidence of the parties' intent." *Talbott v. First Bank Fla., FSB*, 59 So. 3d 243, 245 (Fla. 4th DCA 2011). A court must interpret a contract "in a manner that accords with reason and probability," endeavoring to "avoid an absurd construction." *Katz v. Katz*, 666 So. 2d 1025, 1028 (Fla. 4th DCA 1996).

A contract should be read as a whole. *Discover Prop. & Cas. Ins. Co. v. Beach Cars of W. Palm, Inc.*, 929 So. 2d 729, 732 (Fla. 4th DCA 2006). Courts must give reasonable meaning to all provisions of a contract, rather than rendering part of the contract useless. *Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004). Specific provisions in a contract control over general provisions. *Bridges v. City of Boynton Beach*, 927 So. 2d 1061, 1063 (Fla. 4th DCA 2006). Furthermore, "the headings or subheadings of a document do not dictate the meaning of the entire agreement, especially where the literal language of the heading is contrary to the agreement's overall scheme." *Hinely v. Fla. Motorcycle Training, Inc.*, 70 So. 3d 620, 624 (Fla. 1st DCA 2011). An ambiguous contractual provision must be construed against the drafter. *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000).

Here, the only reasonable interpretation of the subcontract is that the scope of work did not include the removal and replacement of the asphalt eastern driveway of the parking lot. "Asphalt" and "concrete" are not synonymous terms. Nothing in the subcontract stated that the Sub was required to remove any asphalt from the parking lot. The subcontract did not say that the Sub was required to remove pavement from the "entire" parking lot. Nor did the subcontract describe the specific square footage of pavement that the Sub was to remove.

To be sure, the subcontract contained general titles and headings such as "Replace Pavement" and "Replace Parking Area," and set forth a general Summary of Work stating that "[t]he existing pavement should be demolished." However, the specific provisions governing the subcontract's scope of work control over the headings and other general language in the subcontract. In multiple places of the subcontract, the specific description of the scope of work called for the Sub to replace "the existing concrete pavement" or "the existing Portland cement concrete pavement." The subcontract even specified the thickness of the concrete to be removed, but provided no similar specification for the existing asphalt.

4

While Schedule A stated that the work was "not limited to" the enumerated tasks, including disposal of the existing concrete pavement, the phrase "not limited to" modified the phrase "Sitework . . . necessary to complete the project in accordance with the contract plans and specifications." Thus, although the phrase "not limited to" implies that there may be some unenumerated tasks that are necessary to complete the project, the phrase cannot be used to expand the required tasks beyond the "contract plans and specifications."

Documents used to prepare the bid and pre-contract communications do not change the interpretation of the subcontract. The subcontract required the Sub to rely on its own examination of the site, not on the opinions or representations of the GC or the Postal Service. The subcontract also contained a merger clause indicating that representations made previous to the contract were "null and void."[1]

For these reasons, we agree with the trial court's conclusion that the subcontract was "clear and unambiguous as to the work [the Sub] was required to perform. In very specific terms, the [subcontract] explains in multiple places what material was to be removed from the parking lot—Portland cement concrete—and what material was to be installed—asphalt."

### The Dispute Resolution Clause of the Contract Cannot be Used to Rewrite Express Language in the Contract Concerning the Scope of Work

The subcontract included this provision regarding "DISPUTES":

Should any dispute arise between the parties respecting the true construction or interpretation of the Plans, Specifications and/or the Contract Requirements, the decision of the Owner or the Owner's designated representative as set forth in the General Contract shall be final.

---

[1] A pre-contract drawing that depicted the entire parking area does not alter our interpretation of the subcontract. The General Notes on the document stated that the drawing was "diagrammatic only" and that the subcontractor should "verify all dimensions." Moreover, the Order of Preference provision in the Master Contract stated that "[i]n case of discrepancy or conflicts between drawings and specifications, the specifications will govern." The specifications unambiguously call for the removal of concrete, not asphalt.

The law does not permit a party to use such a clause to rewrite the express language of a contract.

"Construction projects frequently provide that, during the course of the project, disputes over the meaning of the contract documents, drawings and specifications will be decided by the architect." *James A. Cummings, Inc. v. Young*, 589 So. 2d 950, 953 (Fla. 3d DCA 1991) (quoting 2 *Construction and Design Law* § 11.7 (1984)). "As a general rule, the architect's interpretation of the contract will be adopted by the court absent a showing of fraud, bad faith or gross mistake on the part of the architect." *Id.* (quoting 2 *Construction and Design Law* § 11.7 (1984)).

"When parties to a contract agree by its express terms to be bound to the determination made by an architect, that agreement is binding upon the parties." *Id.* at 954 (citing *Willcox v. Stephenson*, 11 So. 659 (Fla. 1892)). "In the absence of fraud, or such mistake as would amount to fraud, the determination made by the architect shall be final." *Id.*

The Florida Supreme Court has cautioned that "construction contracts cannot leave the arbitrary or fraudulent decision of an architect or engineer or the like to operate as a conclusive settlement of matters in controversy." *Duval Cnty. v. Charleston Eng'g & Contracting Co.*, 134 So. 509, 514 (Fla. 1931). As a Louisiana court has succinctly stated, "a contract clause providing the architect or engineer shall be the final arbiter of disputes is binding upon the parties unless the architect or engineer's decision is manifestly arbitrary or rendered in bad faith." *J. H. Jenkins Contractor, Inc. v. City of Denham Springs*, 216 So. 2d 549, 553 (La. Ct. App. 1968).

The GC argues that the "DISPUTES" provision of the subcontract makes the Postal Service the final arbiter of all disputes concerning the plans and specifications. But the law is more nuanced. The law does not allow a third party's arbitrary decision concerning the scope of a contract's specifications "to operate as a conclusive settlement of matters in controversy." *Duval Cnty.*, 134 So. at 514. The GC appears to argue for an interpretation of the subcontract that would preclude judicial scrutiny of even an arbitrary interpretation of the scope of the subcontract. Application of such a principle would unfairly allow the revision of the explicit scope of a subcontract after work has commenced, to the detriment of the subcontractor.

In this case, to the extent that the Postal Service's architect determined the scope of the project specifications in the subcontract, the determination was a "gross mistake" and was manifestly arbitrary. As noted above, the only reasonable interpretation of the subcontract is that it did not encompass the removal of the existing asphalt on the parking lot.

Importantly, the architect's decision had little to do with the actual language of the subcontract. Rather, the architect reasoned that because the GC's bid was based on the parking lot's total area of 89,388 square feet, the asphalt pavement area was already considered in the cost. In other words, USPS ultimately denied any additional compensation (and, in fact, reduced the compensation to the GC) because the GC's Price Proposal quoted a price for concrete removal that included the total area of all the pavement in the parking lot, including the existing asphalt portion. But the GC's mistake—bidding the job to USPS on the erroneous assumption that the entire parking lot consisted of concrete—had nothing to do with the proper interpretation of the subcontract.

### *The Trial Court Erroneously Entered Summary Judgment on the Breach of Contract Count Because the GC Did Not Breach any Provision of the Subcontract*

We agree with the GC that the trial court erred in granting summary judgment in favor of the Sub on the breach of contract claim, as the record does not show that the GC breached any provision of the subcontract.

An essential element of a claim for breach of contract is the existence of a material breach of a contractual duty. *Chetu, Inc. v. KO Gaming, Inc.*, 261 So. 3d 605, 606 (Fla. 4th DCA 2019). "[W]hen a contract is silent on a matter, the court cannot impose contractual rights and duties under the guise of construction." *Blok Builders, LLC v. Katryniok*, 245 So. 3d 779, 784 (Fla. 4th DCA 2018).

This case differs from *W&J Construction Corp. v. Fanning/Howey Associates*, 741 So. 2d 582 (Fla. 5th DCA 1999), upon which the trial court relied below, because the contractual language in the two cases is different. In *Fanning/Howey*, the Fifth District addressed a dispute between a contractor and an owner concerning the scope of a fire protection system called for by the contract. The Fifth District reversed a summary judgment in favor of the owner, concluding that a factual issue remained as to whether the owner breached the contract by failing to issue a formal written change order as called for by the contract provisions:

> In this case, the essence of this dispute is whether the original contract specifications and engineering requirements encompassed the work [which the contractor] claims was above and beyond that originally required by the contract. If it did, then [the contractor] is entitled to no additional compensation. If it did not, because the [owner] required [the contractor] to do the work yet failed to issue a change order as it should have done pursuant to the contract, [the contractor] may be entitled to compensation.

*Id.* at 584. However, the contract in *Fanning/Howey* stated that a "[c]hange order *shall be issued* for the amounts of cost and time determined by the Owner and shall become binding upon the Contractor . . . ." *Id.* at 583 n.4 (emphasis added).

While this case bears some similarity to *Fanning/Howey*, the contractual language here at issue is different. The subcontract stated that the GC had the "right" to "make changes, additions and/or deletions in the Work, upon written order to Subcontractor." Further, the subcontract provided that the value of the work as changed "shall be stated in the written order, approved by Contractor, and the Subcontract Price shall be adjusted." Should the parties be unable to agree on the value, the subcontract provided that "the determination of the amount of such addition or reduction by the Owner as provided in the General Contract shall be binding on the Subcontractor and the Contractor."

However, the subcontract also stated that "[n]o extra work or changes from Plans and Specifications or from this Agreement will be recognized or paid for unless agreed to in writing before the extra work is started or the changes made." Likewise, the subcontract stated that "any claims for extras demanded by the Subcontractor arising from omissions and/or discrepancies in the Plans or Specifications shall not be binding upon the Contractor or honored by the Contractor except to the extent previously approved and the extent actually paid for by the Owner."

Here, as the GC argues, it never executed the Sub's work order and no contractual provision in the subcontract required it to do so. The GC consistently—albeit erroneously—maintained that the replacement of the asphalt in the B5 area was within the subcontract's original scope of work. While the GC wanted the Sub to perform extra work, this conduct did not amend the subcontract. The GC did not approve the work order. It did not agree to the price stated on the work order. The Postal Service did not make a determination of the value of the extra work described in the work

order and it did not "actually pa[y] for" the extra work. For these reasons, we reverse the summary judgment as to the breach of contract count.

### *The Trial Court Properly Entered Summary Judgment on Liability as to the Implied Contract Theories of Recovery—Unjust Enrichment and Quantum Meruit*

We affirm the summary judgment as to liability on the unjust enrichment and quantum meruit claims.

The distinction between quantum meruit and unjust enrichment is often blurred "by the potential for both theories to apply to the same factual setting." *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 387 (Fla. 4th DCA 1997). The doctrine of quantum meruit, also called a contract implied in fact, imposes liability, in the absence of an express agreement, "based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words." *Id.* at 385. As we explained in *Commerce Partnership*:

> Where an agreement is arrived at by words, oral or written, the contract is said to be "express." A contract implied in fact is not put into promissory words with sufficient clarity, so a fact finder must examine and interpret the parties' conduct to give definition to their unspoken agreement.

*Id.* (internal citations omitted).

To satisfy the elements of quantum meruit, the plaintiff must prove that "the plaintiff provided, and the defendant assented to and received, a benefit in the form of goods or services under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit normally would expect to pay for it." *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 305 (Fla. 1st DCA 1999).

An action for unjust enrichment (also called a contract implied in law or a quasi-contract), is not based upon the finding, by a process of implication from the facts, of an agreement between the parties. "A contract implied in law is a legal fiction, an obligation created by the law without regard to the parties' expression of assent by their words or conduct." *Commerce P'ship*, 695 So. 2d at 386. "The fiction was adopted to provide a remedy where one party was unjustly enriched, where that party received a benefit under circumstances that made it unjust to retain it without giving compensation." *Id.*

9

The elements of a cause of action for unjust enrichment are that: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it. *Id.*

As a general principle, a plaintiff cannot pursue an implied contract theory, such as unjust enrichment or quantum meruit, if an express contract exists. *See Fulton v. Brancato*, 189 So. 3d 967, 969 (Fla. 4th DCA 2016) (stating that a plaintiff cannot pursue unjust enrichment or quantum merit "if an express contract exists"); *Daake v. Decks N Such Marine, Inc.*, 201 So. 3d 179, 181 (Fla. 1st DCA 2016) ("Quantum meruit is premised upon the absence of an express and enforceable agreement; accordingly, the existence of a valid, written contract between the parties necessarily precludes the doctrine's application."); *Corn v. Greco*, 694 So. 2d 833, 834 (Fla. 2d DCA 1997) (explaining that the legal fiction of quantum meruit cannot be maintained "when the rights of the parties are described in a written contract").

This general principle has often been misapplied to *all* disputes arising out of an express contract. Reliance upon a theory of implied contract is barred only if an express contract concerns the same subject matter as the implied contract. *See Atlantis Estate Acquisitions, Inc. v. DePierro*, 125 So. 3d 889, 893 (Fla. 4th DCA 2013) ("Unjust enrichment cannot apply where an express contract exists which allows the recovery."); *Solutec Corp. v. Young & Lawrence Assocs.*, 243 So. 2d 605, 606 (Fla. 4th DCA 1971) ("Any proof of an express agreement between the parties as to the compensation to be paid for the services rendered would defeat . . . an action based upon quantum meruit . . . ."); *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008) ("[A] plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter."); *Kovtan v. Frederiksen*, 449 So. 2d 1, 1 (Fla. 2d DCA 1984) ("It is well settled that the law will not imply a contract where an express contract exists concerning the same subject matter.").

The proposition that "the law will not imply a contract where a valid express contract exists" has been described by Professor Corbin as "misleading." *S. Bell Tel. & Tel. Co. v. Acme Elec. Contractors, Inc.*, 418 So. 2d 1187, 1189 (Fla. 4th DCA 1982). The real meaning of this statement is the following:

> [W]here the parties have made an express contract, the court should not find a different one by "implication" concerning the

same subject matter if the evidence does not justify an inference that they intended to make one. . . . [T]he fact that an express contract has been made does not prevent the parties from making another one tacitly, concerning the same subject matter or a different one.

*Id.* (quoting 3 A. L. Corbin, *Corbin on Contracts* § 564 (1960 ed.)).

Florida has long recognized that an implied contract may arise out of an express contract where a contractor or subcontractor performs "extras" not covered by the original contract. In *DeLotto v. Fennell*, 56 So. 2d 518 (Fla. 1951), the Florida Supreme Court wrote:

When parties enter into an agreement or contract for construction work and during the progress thereof alterations or changes are requested in the form of extras and otherwise, then the law implies an obligation to pay the reasonable costs thereof in addition to the stipulated sum named by the parties in the original agreement.

*Id.* at 520 (Fla. 1951); *see also Forest Constr., Inc. v. Farrell-Cheek Steel Co., Fla. Diversified Props. Div.*, 484 So. 2d 40, 42 (Fla. 2d DCA 1986) ("[T]he law implies an obligation to pay a reasonable cost for the extras not provided for in a contract[.]"); *Davis v. Dep't of Health & Rehab. Servs.*, 461 So. 2d 210, 212 (Fla. 1st DCA 1984) ("[W]here a contract exists and changes or alterations are requested by the owner, the law does imply an obligation to 'pay the reasonable costs thereof[.]'"); *Broderick v. Overhead Door Co. of Fort Lauderdale*, 117 So. 2d 240, 243 (Fla. 2d DCA 1959) ("When parties enter into an agreement for construction work and during the progress of the construction changes are requested and made in the form of extras, then the law implies an obligation to pay the reasonable cost thereof in addition to the stipulated sum named in the original agreement.").

This case falls squarely under the rule of *DeLotto*.[2] The GC and the Sub entered into a construction contract. While the Sub performed under the contract, the GC requested and accepted a change to the scope of work, an extra that the GC erroneously claimed was included within the work described in the subcontract. Under these circumstances, "the law implies an obligation to pay the reasonable costs thereof in addition to the

---

[2] Although *DeLotto* involved an oral express contract rather than a written agreement, the principle of *DeLotto* still applies here.

stipulated sum named by the parties in the original agreement." *DeLotto*, 56 So. 2d at 520.

The GC is also liable under a theory of unjust enrichment. The Sub conferred a benefit on the GC in the form of asphalt removal and replacement that was required under the master contract but not the subcontract. The GC accepted the benefit and the circumstances are such that it would be inequitable for the GC to retain the benefit without paying fair value for it. As the trial court ruled, "it would be both inequitable and unjust to allow [the GC] to retain the benefit without paying [the Sub] fair value for it, because it was [the GC's] unilateral mistake and breach of the General Contract that created the problem."

The existence of the subcontract did not defeat recovery under either implied contract theory of recovery, as the subcontract did not cover removal and replacement of the existing asphalt.

### The Trial Court Erred in Granting Summary Judgment on the Issue of Damages

We reverse the award of damages because issues of fact remain on that issue.

The measure of damages in a quantum meruit action is the reasonable value of the labor performed and the market value of the materials furnished. *Dean v. Blank*, 267 So. 2d 670, 671 (Fla. 4th DCA 1972).

Damages in an action for unjust enrichment "may be valued based on either (1) the market value of the services; or (2) the value of the services to the party unjustly enriched." *Merle Wood & Assocs., Inc. v. Frazer*, 45 Fla. L. Weekly D2635, 2020 WL 6937855, at *2 (Fla. 4th DCA Nov. 25, 2020) (quoting *Alvarez v. All Star Boxing, Inc.*, 258 So. 3d 508, 512 (Fla. 3d DCA 2018)). The measure of damages for unjust enrichment is the value of the benefit conferred, not the amount the plaintiff hoped to receive or the cost to the plaintiff. *See Am. Safety Ins. Serv., Inc. v. Griggs*, 959 So. 2d 322, 332 (Fla. 5th DCA 2007) (holding that an award of damages for unjust enrichment was not supported by competent, substantial evidence where the plaintiffs "only presented evidence of the money they hoped to receive" and did not present evidence of the value of the benefit conferred); *Levine v. Fieni McFarlane, Inc.*, 690 So. 2d 712, 713 (Fla. 4th DCA 1997) (explaining that it is the "the benefit to the owner, not the cost to the improver," which is the basis for an award for unjust enrichment).

Here, the Sub failed to meet its burden of proving that there were no genuine issues of material fact as to damages on its claims for quantum meruit and unjust enrichment. On the issue of damages, the Sub presented only (1) a proposed change order showing the $33,386.80 price the Sub wanted to charge for the asphalt removal and replacement and (2) a separate document showing a breakdown of costs for the proposed change order. While such evidence would have been sufficient had the Sub prevailed on its express contract count, it did not meet what was required under either implied contract theory.

The Sub presented no evidence of the reasonable value of the labor and materials it provided on the B5 phase of the project. There was no opinion evidence as to the market value of the services performed on the B5 asphalt phase of the project. Nor does the record contain any evidence as to the number of man-hours spent on this phase of the project, the reasonable hourly rate for labor or equipment used, or the market value of materials furnished.

The record contains no evidence establishing the amount of the Sub's damages under either quantum meruit or unjust enrichment.

### *Conclusion*

We affirm the summary judgment as to liability under the quantum meruit and unjust enrichment counts, reverse the summary judgment on the breach of contract count, and remand for further proceedings on the issue of damages under the implied contract theories of recovery.

*Affirmed in part, reversed in part, and remanded.*

LEVINE, C.J., and CONNER, J., concur.

\*     \*     \*

**Not final until disposition of timely filed motion for rehearing.**

13